IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 22-13907-C

_____

STEWART PARNELL,

Appellant,

v.

UNITED STATES OF AMERICA,

Appellee.

_____

**BRIEF OF APPELLANT**

_____

Amy Lee Copeland
Georgia Bar No. 186730
Rouse + Copeland LLC
602 Montgomery Street
Savannah, Georgia 31401
(912) 807-5000

Attorney for Appellant

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

STEWART PARNELL,                     )
                                     )
                    Appellee,        )
                                     )
vs.                                  )      No. 22-13907-C
                                     )
UNITED STATES,                       )
                                     )
                    Appellant.       )

**CERTIFICATE OF INTERESTED PERSONS**

As required by 11th Cir. Rule 26-1, Appellant Stewart Parnell files

his certificate of interested persons as follows:

A.L. Shutzman

Abbott Labs

American Almond Product

American Importing Co.

Asian Foods

Atlanta Nut Co.

Aurora Products, Inc.

Austin, Edward S.

Blume, Michael

C-1 of 4

*Parnell v. United States*, 22-13907-C

Boca Isle Foods, Inc. Boca Grande Foods

Bondurant Jr., Thomas J.

Cereal Byproducts Co.

Copeland, Amy Lee

Dasher, Kenneth A.

Dot Foods

Eillien's Candies, Inc.

Englehart, Mary M.

Falcon Trading Company

Fieldbrook Foods Corp.

Forward Foods

Fresca Foods

GKI Foods

Hartford Insurance Co.

Hearn, Patrick H.

Hodges, Kenneth

Hodges, Speare I.

*Parnell v. United States*, 22-13907-C

Ice Cream Specialties

Kellogg

King Nut Company

Langstaff, Honorable Thomas Q.

Lightsey, Samuel

Lovin Oven/ ConAgra

Lugar, Justin

Marra Bros.

McEwen, Leah

Moore, Michael J.

Natural Foods

NIDA Trading

Parnell, Michael

Parnell, Stewart

Peanut Corporation of America

Perry's Ice Cream Co.

Primrose Candy

*Parnell v. United States*, 22-13907-C

Pro-NuTech

Rouse & Copeland, LLC.

Sands, Honorable W. Louis

Specialty Commodities

Superior Nut

United Natural Foods

Weil, Amy

Westcott Nut Products

Wilkerson, Mary

Zachary Confections

This 25th day of July, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

Rouse + Copeland, LLC
602 Montgomery Street
Savannah, Georgia 31401
912-807-5000
912-335-3440 (fax)
ALC@roco.pro

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Stewart Parnell proceeds pursuant to a Certificate of Appealability issued by this Court with respect to two *Skilling*-related issues. While the facts and legal argument are adequately presented in this brief and on the record, *see* Fed. R. App. P. 34(a)(2)(C), the second issue is novel, which counsels argument. *See* Fed. R. App. P. 34(a)(2)(B). Parnell requests argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................... C-1

STATEMENT REGARDING ORAL ARGUMENT .................................. i

TABLE OF CONTENTS ..................................................... ii

TABLE OF CITATIONS ..................................................... v

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES ................................................. 2

STATEMENT OF THE CASE ................................................. 3

   1. Course of proceedings and disposition in the court below ............. 3

   2. Statement of the facts .................................................. 4

      a. Blakely, Georgia (the site of PCA), the Albany Division, and the importance of the peanut industry to those areas ..................... 6

      b. The news reports published about Parnell's case, including discussions of nine deaths attributed to the salmonella outbreak ...................................................... 8

      c. Venirepersons' statements about those news reports, including about the nine deaths, during jury selection ........................... 20

      d. Venirepersons' entanglement with the peanut industry, whether through financial, personal, or familial ties ............... 24

e.  What happened at trial ............................................... 28

f.  What happened in the §2255 proceedings ................................ 29

3.  Statement of the standard of review ............................................. 30

SUMMARY OF THE ARGUMENT ........................................................ 31

ARGUMENT AND CITATION OF AUTHORITY ................................. 32

1.  Whether the district court erred in determining that Parnell could not establish a presumption of jury prejudice, based on adverse pretrial publicity, under *Skilling v. United States*, 561 U.S. 358 (2010). ......................................................................... 32

a.  The size and characteristics of the community .................... 36

b.  Whether news stories about the allegations in the indictment contained blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight ............................................................ 38

c.  "The decibel level of media attention" in the run-up to trial ......................................................................... 41

d.  A verdict that did not undermine the supposition of jury bias ......................................................................... 43

2.  Whether a showing of presumed jury prejudice, under *Skilling,* operates to establish both prongs of an ineffective assistance of counsel claim, based on counsels' failure to move for a change of venue ......................................................................................... 44

CONCLUSION ......................................................................................... 51

CERTIFICATE OF COMPLIANCE........................................................ 52

CERTIFICATE OF SERVICE................................................................. 53

# TABLE OF CITATIONS

## **Cases**

*Arizona v. Fulimante*, 499 U.S. 279 (1991) ...........................................50

*Chapman v. California*, 386 U.S. 18 (1967) .......................................... 49

*Coleman v. Kemp*, 778 F.2d 1487 (11th Cir.1985).......................33-34, 49

*Dobbert v. Florida*, 432 U.S. 282 (1977) ............................................... 35

*Estes v. Texas*, 381 U.S. 532 (1965)....................................................... 40

*Harvey v. Warden*, 629 F.3d 1228 (11th Cir. 2011) ................................ 44

*In re Murchison,* 349 U.S. 133 (1955) .................................................... 33

*Kemp v. United* States, ___ U.S. ___, 142 S. Ct. 1856 (2022) ...............1-2

*Manning v. State*, 378 So.2d 274 (Fla. 1979)....................................34-35

*McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984) .............50

*McKay v. United States*, 657 F.3d 1190 (11th Cir. 2011) ........................ 30

*Meeks v. Moore*, 216 F.3d 951 (11th Cir. 2000)..................................33-34

*Murphy v. Florida*, 421 U.S. 794, 799 (1975) ...................................48-49

*Patterson v. Colorado,* 205 U.S. 454 (1907) ............................................ 33

*Rideau v. Louisiana*, 373 U.S. 723 (1963) .........................................39-40

*Sheppard v. Maxwell*, 384 U.S. 333 (1966)............................................. 40

*\*Skilling v. United States*, 561 U.S. 358 (2010) ............................. *passim*

*Spencer v. Sec'y, Dep't of Corr.,* 609 F.3d 1170 (11th Cir. 2010)............. 30

\*_Strickland v. Washington_, 466 U.S. 668 (1984) ........................... *passim*

*United States v. Cronic*, 466 U.S. 648 (1984) ......................................... 48

*United States v. Parnell*, 723 Fed. Appx. 745 (11th Cir. 2018) ........... 4, 23

*Weaver v. Massachusetts*, 582 U.S. 286 (2017) ................................. 49-50

## Statutes

28 U.S.C. §2255 ................................................................ *passim*

28 U.S.C. §2255(a) .................................................................... 1

28 U.S.C. §2255(c) .................................................................... 1

28 U.S.C. §2255(f)(1) ................................................................. 1

## Rules

11th Cir. R 28-5 ....................................................................... 1

Fed. R. App. P. 4(b)(1)(B)(i) ...................................................... 2

Fed. R. App. P. 32(a)(5) ........................................................... 52

Fed. R. App. P. 32(a)(6) ........................................................... 52

Fed. R. App. P. 32(a)(7)(B)(i) .................................................... 52

Fed. R. App. P. 32(f) ............................................................... 52

Fed. R. App. P. 34(a)(2)(B) ......................................................... i

Fed. R. App. P. 34(a)(2)(C) ......................................................... i

Rules Governing 2255 Proceedings 11(b) .................................................. 2

Sup. Ct. R. 13.3 ....................................................................................... 2

**<u>Other</u>**

https://en.wikipedia.org/wiki/Blakely,_Georgia (accessed 5/31/23) ......... 7

https://en.wikipedia.org/wiki/Southwest_Georgia (accessed 6/21/23) ...... 6

https://www.albanyherald.com/news/this-year-early-focuses-on-celebrating-peanuts/article_489d87b4-f54d-5819-80dc-cb9b8a45e9b8.html ................................................................................... 12

https://www.earlycountynews.com/articles/blakely-receives-large-food-bank-donation/ ...................................................................................... 19

https://www.earlycountynews.com/articles/fbi-agents-descend-on-pca-plant-monday/ ............................................................................... 13, 17-18

https://www.earlycountynews.com/articles/fda-alleges-pca-knowingly-shipped-tainted-products/ ........................................................... 12, 16-17

https://www.earlycountynews.com/articles/now-that-we-have-your-attention/ ............................................................................................... 13-14

https://www.earlycountynews.com/articles/officials-pointing-to-blakely-plant-in-43-state-salmonella-outbreak/ .................................................. 15

https://www.earlycountynews.com/articles/pca-investigation-continues-texas-plant-linked-to-outbreak/ .............................................. 14-15, 18-19

https://www.earlycountynews.com/articles/peanut-product-recalls-grow/ ......................................................................................... 15-16

https://www.earlycountynews.com/articles/salmonella-poisoning-investigation-continues/ ......................................................... 16

https://www.earlycountynews.com/articles/salmonella-trial-underway/ ......................................................................................... 19-20

https://www.gamd.uscourts.gov/offices/albany (accessed 6/21/23) ........... 6

https://www.npr.org/templates/story/story.php?storyId=100468084 ..... 10

https://www.npr.org/templates/story/story.php?storyId=99885673 ....... 11

https://www.peanutproudfestival.com/ (accessed 5/31/23) ....................... 7

www.cityofblakely.net (accessed 5/31/23) ................................................. 7

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

On September 30, 2015, and by amended judgment on April 7, 2016, the United States District Court for the Middle District of Georgia sentenced Appellant Stewart Parnell to 336 months' imprisonment. (Doc 620)[1] In appeal number 15-14400, this Court affirmed Parnell's convictions and sentence on January 23, 2018, and his timely-filed petition for rehearing on June 11, 2018. (Doc 640, Doc 642)

Parnell filed a 28 U.S.C. §2255 motion in the Middle District of Georgia on September 6, 2019. (Doc 667) This was the appropriate court. *See* 28 U.S.C. §2255(a) (directing filing of §2255 motion in "court which imposed the sentence). Since this motion was filed within 90 days of the denial of the petition for rehearing, it was timely. *See* 28 U.S.C. §2255(f)(1) (providing for one-year limitation period from date the judgment of conviction was final); *Kemp v. United States*, ___ U.S. ___, 142 S. Ct. 1856, 1860 (2022)(noting that "judgment becomes final when the time to seek certiorari expires – ordinarily, 90 days after

---

[1] As required by 11th Cir. R. 28-5, Parnell cites the record by document and page number. He cites transcripts by the document number and the sequential page number assigned by the court reporter.

judgment"); Sup. Ct. R. 13.3 (running time for filing writ "from the date of the denial of [a timely-filed petition for] rehearing"). The district court denied Parnell's §2255 motion and entered judgment on September 23, 2022. (Doc 803, Doc 804) On November 17, 2022, Parnell filed a notice of appeal. (Doc 805) Since this filing occurred within 60 days of the denial of the §2255 motion, it was timely. *See* Fed. R. App. P. 4(a)(1)(B)(i); *see also* Rules Governing Section 2255 Proceedings 11(b) (providing that Fed. R. App. P. 4(a) governs the time to appeal disposition of a §2255 motion).

On May 16, 2023, this Court issued a certificate of appealability ("COA") to Parnell on the two issues he now raises on this appeal. Thus, the Court has jurisdiction over these two issues under 28 U.S.C. §2255(c).

## STATEMENT OF THE ISSUES

As directed in the May 16, 2023, COA, Parnell proceeds on the following two issues:

1. Whether the district court erred in determining that Parnell could not establish a presumption of jury prejudice, based on adverse

pretrial publicity, under *Skilling v. United States*, 561 U.S. 358
(2010); and

2. Whether a showing of presumed jury prejudice, under *Skilling*,
   operates to establish both prongs of an ineffective assistance of
   counsel claim, based on counsels' failure to move for a change in
   venue.

## STATEMENT OF THE CASE

### 1. <u>Course of proceedings and disposition in the court below.</u>

In 2014, a jury in the Albany Division of the Middle District of
Georgia convicted Parnell on 67 counts charging conspiracy,
introduction of adulterated and misbranded food into interstate
commerce, interstate shipments fraud, wire fraud, and obstruction of
justice stemming from a salmonella outbreak tied to PCA; it acquitted
him of a single count of wire fraud. (Doc 1, Doc 285) He received a
sentence of 336 months' imprisonment. (Doc 620) According to the
inmate locator at [www.bop.gov](www.bop.gov), Parnell remains incarcerated with a
projected release date of July 26, 2038.

Parnell filed an unsuccessful direct appeal, part of which
challenged the trial jury's exposure to extrinsic evidence of nine deaths

linked to the salmonella outbreak. *See United States v. Parnell*, 723 Fed. Appx. 745, 748-51 (11th Cir. 2018). Parnell then filed a timely §2255 motion (Doc 667), which the district court denied after an evidentiary hearing. (Doc 803) After a timely notice of appeal of that order (Doc 805), he received a certificate of appealability from this Court to pursue the two claims he raises in this appeal.

## 2. <u>Statement of the facts.</u>

Stewart Parnell owned the Peanut Corporation of America ("PCA"), a peanut processing plant in Blakely, Georgia, a small town in southwest Georgia 48 miles southwest of Albany. In early 2009, the FDA descended on PCA after a salmonella outbreak traced back to the plant. The investigation eventually led to criminal charges being filed against Parnell and others in the Albany Division of the United States District Court for the Middle District of Georgia. Parnell stood trial with his brother Michael (an independent food broker) and Mary Wilkerson (PCA's quality assurance manager). A jury convicted Parnell in 2014 on all but one count of the 68 counts against him, and he is currently serving a 336-month sentence.

Both COA issues require consideration of *Skilling v. United States*, 561 U.S. 358, 367, 377-85 (2010), a case arising from the collapse of Enron Corporation and follow-on criminal trials in Houston, Texas. To determine whether to presume prejudice from media coverage surrounding trial in a certain community, *Skilling* directs courts to consider the size and characteristics of the relevant community, whether news stories contained "blatantly prejudicial information," whether "the decibel level of media attention" diminished prior to trial, and whether the jury's verdict undermines a supposition of juror bias. *Id*. at 382-84.

In light of the *Skilling* test, Parnell now discusses Blakely, Georgia (the site of PCA), the Albany Division, and the importance of the peanut industry to those areas; the news reports published about his case, including discussions of nine deaths attributed to the salmonella outbreak; venirepersons' statements during jury selection about those news reports, including about the nine deaths; venirepersons' entanglement with the peanut industry, whether through financial, personal, or familial ties; what happened at trial; and what happened in the §2255 proceedings.

### a. Blakely, Georgia (the site of PCA), the Albany Division, and the importance of the peanut industry to those areas.

The Albany Division of the Middle District of Georgia serves eighteen counties in the southwest pocket of the state: Baker, Ben Hill, Calhoun, Crisp, Decatur, Dougherty, Early, Grady, Lee, Miller, Mitchell, Schley, Seminole Sumter, Terrell, Turner, Webster, and Worth. *See* https://www.gamd.uscourts.gov/offices/albany (accessed 6/21/23)[2] "Court records show that the jury pool from which jurors were selected in the Albany Division . . . was over 8,000 in number." (Doc 795-Pg 17) "Although Blakely itself is a 'small farming town,' the population of the division from which the jury was taken was much larger and contains areas considered to be more urban in comparison, with a population . . . over 340,000." (Doc 795-Pg 17)

About 60% of domestic peanuts are grown within a 150-mile radius of Albany, Georgia, the peanut capital of America and the "heartbeat" of that industry. (Doc 777-Pg 207) Blakely, the

---

[2] Most of those counties are counties comprising Southwest Georgia – colloquially known as "Sowega," the poorest and least-populated region in the state. *See* https://en.wikipedia.org/wiki/Southwest_Georgia (accessed 6/21/23)

headquarters of PCA and the county seat of Early County, is a town of about 5,000 people and an hour from Albany. *See* www.cityofblakely.net (accessed 5/31/23) Peanuts are so important to Blakely that it holds "an annual celebration that honors the peanut industry and what it means to our community." *See* https://www.peanutproudfestival.com/ (accessed 5/31/23) As a result of the PCA salmonella investigation announced in early 2009, "[t]he company shut the plant and laid off all of the plant's roughly 50 employees for the duration of the investigation, which caused economic hardship for the town during the 2009 recession." *See* https://en.wikipedia.org/wiki/Blakely,_Georgia (accessed 5/31/23); (Doc 667-1-Pg 4) In other words, about 1% of the town's population lost their jobs as a result of the salmonella outbreak. (Doc 667-1-Pg 4)

An Albany peanut broker confirmed at the §2255 hearing that the salmonella outbreak at PCA "devastated" the industry. (Doc 777-Pgs 199, 203). When the news about PCA broke, "[h]eadlines started flying," and "it became apparent that this thing was a big, big deal." (Doc 777-Pg 204) About every peanut-affiliated business – whether farmers, shellers, cold storage providers, blanchers, roasters, baggers, crushers,

equipment manufacturers, or truckers – suffered. (Doc 777-Pgs 205-206) Here is how the broker described the impact:

> [E]verybody I worked with was affected negatively. Demand was down. Prices were falling. We were too busy as brokers trying to figure out what to do with the peanuts we already had sold, where to push them and where to ship them to get them shipped. I've got friends that are in the trucking industry, friends in the cold storage industry, friends in the blanching industry, friends in the packaging industry, friends in the peanut processing equipment industry that were affected.

(Doc 777-Pg 209) The sentiment in the local community was the area was "under attack by the media," especially after reports of deaths resulting from the salmonella "hit the fan." (Doc 777-Pg 210) There was "a lot of hostility" in the community: "[P]eople were losing millions of dollars on contracts, demand was falling, peanut butter manufacturers were losing demand for peanut butter.  People's jobs were sort of – well, people's jobs were threatened."  (Doc 777-Pg 211)

### b. The news reports published about Parnell's case, including discussions of nine deaths attributed to the salmonella outbreak.

The trial judge began jury selection with the observation that "we'll probably get some responses" when "asking the jury whether or not anyone has heard anything about this case. . . ." (Doc 554-Pgs 2-3) The judge later made this observation:

8

> I think this is the first time in my memory of 20-something years on the bench and 30-something years as a lawyer that we spent all day on one question [i.e., what you've heard about this case, what you know about it, and how you got to know it, and the circumstances].

(Doc 554-Pgs 214-15)

Of the 78 venirepersons, 47 – roughly 60% – indicated that they knew about the case from the news (print, TV, national and local media), their workplaces, family members, friends in the industry, business dealings, and simply living in Blakely.  (Doc 554-Pgs 7, 17, 23, 26, 28, 33, 36, 42, 44-45, 48, 59, 72, 77-78, 82, 87, 91, 100, 110, 113, 118, 128, 132, 139, 157, 161, 162-63, 181, 199, 205, 211, 215, 218, 220-21, 224, 227, 229, 239, 241, 245, 254-55, 268-69, 285-86, 295, 301, 307, 312, 322)

News reports – both national and local – detailed the toll of the PCA case on this close-knit agricultural community. Here is a sampling of some of those reports from both national and local news sources. (Doc 667-Pgs 4-12)

### On NPR (National Public Radio):

*Fallout From Peanut Contamination Hurts Farmers*
February 10, 2009 3:44 PM ET
Heard on NPR, "All Things Considered"

On the edge of Early County, deep in southern Georgia, peanuts are grown on sprawling farms amid tall pine trees and grazing cattle. Mike Newberry's farm isn't too far from the Peanut Corporation of America's processing plant.

"We are still all just reeling from what has happened in Blakely," says Newberry, a fourth-generation farmer.

Newberry says it couldn't have happened at a worse time. Farmers produced the largest peanut crop in U.S. history last year, so warehouses still have a large supply of nuts. The economy is suffering, and now demand for peanut butter and all peanut products is down 25 percent to 30 percent.

"There's no question it hurts my bottom line," Newberry says.

As a result of the salmonella contamination, farmers say they'll plant up to 30 percent fewer peanut acres this year than they did in 2008. Last year, they earned $525 a ton for their peanuts. This year, Newberry says the best he can make is about 70 percent of that.

*                    *                    *

Peanut farmers have reacted powerfully to the salmonella contamination. Farmers in Georgia, the nation's largest peanut-producing state, released a statement expressing disdain for the Peanut Corporation of America.

"It's not an issue that's a farmer issue, but it sure has had a severe impact on our farmers," says Don Koehler, executive director of the Georgia Peanut Commission.

https://www.npr.org/templates/story/story.php?storyId=100468084

*Mayor Of Peanut Plant Town Unprepared For Cuts*
January 26, 2009 4:00 PM ET
Heard on All Things Considered

> Blakley Mayor Ric Hall says he wasn't prepared for the news of the peanut plant shutting. He says peanuts have been the mainstay of the agricultural community ever since the late 1940s.

https://www.npr.org/templates/story/story.php?storyId=99885673

> NORRIS: Now, as we said, this is considered peanut country. Just how important are peanuts to the way of life down there?
>
> Mayor HALL: We are an agricultural community, and peanuts have been the mainstay ever since the boll weevil made his presence known back in the late '40s and people converted to peanuts as their primary cash crop. We've seen that cotton and peanuts now probably equal out at about 50-50 as far as the largest cash crop that is planted by our farms.
>
> NORRIS: So if I were to drive in through the town of Blakely, would I see peanuts on the town's sign? And are you proud of your peanut heritage?
>
> Mayor HALL: Actually, you would. We even have a monument on the square to the peanut.

https://www.npr.org/templates/transcript/transcript.php?storyId=99885673

**From the *Albany Herald*:**

*This year, Early [County] focuses on celebrating peanuts* (March 21, 2010)

> BLAKELY -- Last year, as the world read with horror about the nine deaths and 714 reported illnesses related to consumption of salmonella-tainted peanut products produced by Peanut Corporation of America's processing facility here, the backlash threatened not only this small farming community but the bottom line of Georgia's No. 1 cash crop.

https://www.albanyherald.com/news/this-year-early-focuses-on-celebrating-peanuts/article_489d87b4-f54d-5819-80dc-cb9b8a45e9b8.html

**Published in Blakely's newspaper, the *Early County News*:**

*FDA alleges PCA knowingly shipped tainted products* (February 04, 2009)

> "I know PCA and the State of Georgia want to get to the bottom of this salmonella outbreak that has people on edge about any peanut products," Representative Gerald Greene told the News. "***Media coverage has tried and convicted the community of Blakely and is harming the peanut industry with the type of hype coverage that has occurred***."

https://www.earlycountynews.com/articles/fda-alleges-pca-knowingly-shipped-tainted-products/ (emphasis added).

*FBI agents descend on PCA plant Monday* (February 11, 2009)

> One estimate indicates the salmonella related recall and news of the investigation of PCA's operations has impacted the sale of peanut food products by about 25 percent.

The lack of public confidence resulting from the PCA-salmonella outbreak-recall news, coupled with a huge, 900,000 ton surplus from last year's record crop and a economic recession, pose a problem for farmers and the peanut industry as planting season approaches.

https://www.earlycountynews.com/articles/fbi-agents-descend-on-pca-plant-monday/ (emphasis added).

*Now that we have your attention…* (February 04, 2009)

I guess there is someone out there who knows how, but ***it is difficult to measure exactly how much of the bad publicity from the outrage being directed toward Peanut Corporation of America is rubbing off on the community***.

The outrage from family and friends of those struck by salmonellosis, the many companies being impacted, an angry public and government officials was fast and furious last week when the FDA's findings were made public, and have been relentless since. Even President Barack Obama has weighed in on the issue.

***Some of that outrage originates right here in Early County as well, where all those affected by the salmonella outbreak — including the company's employees and families — are being wrapped in prayer and heartfelt best wishes***.

\*          \*          \*

But, the important thing to understand is that impressions of Blakely and Early County being ingrained in the minds of people across the country by this tragic, ongoing news story are not representative of our community.

13

**And about our peanuts**… The peanut industry's image is suffering a tremendous blow from the alleged actions of [Peanut Corporation of America] and the repercussions of the expected media frenzy.

Some people across the nation are shunning all peanut products because of the problem stemming from this single plant.

https://www.earlycountynews.com/articles/now-that-we-have-your-attention/ (emphasis added).

*PCA investigation continues, Texas plant linked to outbreak* (February 18, 2009)

"While I am outraged by the actions of one company," Congressman Sanford Bishop said in a statement, submitted to the House Energy and Commerce Subcommittee on Oversight and Investigation, "I am equally dismayed and concerned about my constituents in the City of Blakely and Early County, and indeed, across southwest Georgia, who are currently suffering the full financial and economic brunt of the national peanut recall."

"Southwest Georgia, which includes my entire district, is the number one peanut producing region in the country . . . [T]housands of my constituents' livelihoods are directly or indirectly impacted by this peanut recall."

[The executive director of the Texas peanut producers board] noted that PCA handles no more than 2.5 percent of all peanuts processed, yet sales of jarred peanut butter plummeted 22 percent nationwide for the four weeks ending Jan. 24 compared with the same period last year, and suggested February's numbers will likely worsen significantly.

https://www.earlycountynews.com/articles/pca-investigation-continues-texas-plant-linked-to-outbreak/ (emphasis added).


### Published in the *Early County News* (mentions of deaths)

*Officials pointing to Blakely plant in 43-state salmonella outbreak* (January 14, 2009)

> Atlanta Journal-Constitution stated federal investigators have conclusively linked salmonella bacteria to peanut butter manufactured by PCA.

> The outbreak has reportedly sickened over 400 people in 43 states. The U.S. Center for Disease Control and Prevention said Friday that about one in five salmonella victims had been hospitalized. They had not confirmed any deaths associated with the outbreak.

> Monday, however, ***a CDC spokesman said the salmonella poisonings may have contributed to three deaths***. ***And Virginia and Minnesota health officials confirmed Tuesday that three deaths in those states were associated with the salmonella outbreak.***

https://www.earlycountynews.com/articles/officials-pointing-to-blakely-plant-in-43-state-salmonella-outbreak/ (emphasis added).

*Peanut product recalls grow* (January 21, 2009)

> News that the salmonella outbreak that had sickened over 400 people in 43 states had been connected to the Blakely plant appeared in the media Jan. 9.

> Since that time over 470 salmonella illnesses, of which at least 90 had to be hospitalized, and ***six deaths have reportedly been confirmed in at least 43 states***.

https://www.earlycountynews.com/articles/peanut-product-recalls-grow/
(emphasis added).


*Salmonella poisoning investigation continues*
*Outbreak concerns peanut industry* (January 28, 2009)

> FDA spokesman stated Jan. 21 that their investigation had conclusively linked the salmonella found at the Blakely plant to the outbreak in several states.
>
> Stephen Sundlof, director of the Center for Food Safety and Applied Nutrition at the FDA, told the media that traces of salmonella were found in a floor crack near the washroom and on the floor near some pallets at the Blakely facility.
>
> The FDA's website futher (sic) states that the FDA "has no evidence to suggest that the Salmonella Typhimurium contamination originated with any other major manufacturing facility other than PCA.
>
> ***Latest reports are estimating the outbreak has surpassed 500 cases in 43 states and may be related to as many as eight deaths***.

https://www.earlycountynews.com/articles/salmonella-poisoning-investigation-continues/ (emphasis added).


*FDA alleges PCA knowingly shipped tainted products* (February 04, 2009)

> Officials and employees of Lynchburg, Va. based Peanut Corporation of America are now in the crosshairs of criminal investigations in connection with a nationwide salmonellosis outbreak which has allegedly sickened over 500 people in 43 states and ***may be responsible for up to eight deaths***.

16

State and federal officials, including Gov. Sonny Perdue, began calling for criminal investigation last week after the Food and Drug Administration released information alleging the company knowingly shipped peanut products from its Blakely plant which had tested positive for salmonella.

\*  \*  \*

FDA and Center for Disease Control investigators . . . released a report Jan. 27 during a media teleconference which claims that over the last two years the company found salmonella in a dozen internal tests of its products, but shipped them after getting new tests which returned negative results.

In addition to finding traces of salmonella in the plant during inspection of the plant, the FDA announced that last week investigators had also found salmonella contamination in an unopened five-gallon container at the plant and another unopened five-gallon pail in the food bank at First Baptist Church in Blakely.

https://www.earlycountynews.com/articles/fda-alleges-pca-knowingly-shipped-tainted-products/ (emphasis added).

*FBI agents descend on PCA plant Monday* (February 11, 2009)

***The number of deaths blamed on the outbreak stands at eight***, unchanged from last week. The number of cases has grown to nearly 600, however, and the number of recalled products has exploded to over 1,500.

With state and federal officials already calling for criminal investigations, the situtation (sic) took a turn for the worse Friday when the FDA alleged PCA knowingly shipped some contaminated product without retesting.

17

After reviewing testing and shipment dates, the FDA stated "it was discovered that not only did the company ship some of the lots before retesting for the bacterium was completed, they also shipped some lots without ever having a second test performed, even though the first test was positive for salmonella."

The new findings show that the plant sometimes shipped products before receiving results of salmonella tests. Other times, the company shipped products, then later received test results that were positive for salmonella, the report stated. Sometimes no additional testing appears to have been done, the FDA said. It remains unclear whether Peanut Corp. alerted its customers to the positive salmonella test results.

https://www.earlycountynews.com/articles/fbi-agents-descend-on-pca-plant-monday/ (emphasis added).

*PCA investigation continues, Texas plant linked to outbreak* (February 18, 2009)

There has been a whirlwind of headlines surrounding the salmonella outbreak blamed on Peanut Corporation of America since the Feb. 6 announcement by FDA officials alleging PCA company officials knowingly shipped tainted products.

The headlines included… "Congress to hold hearings on salmonella outbreak"… "PCA officials refuse to testify at congressional hearing"… ***"Ninth victim claimed by salmonella outbreak"***… "PCA files bankruptcy"… "Salmonella found at PCA's Plainview, Texas plant"… "Texas officials order recall of all products ever shipped from Plainview plant"… "Six Colorado salmonella cases linked to Texas plant"…

In the meantime, the number of salmonella cases has grown to over 600 in 44 states and the number of recalled products has surpassed 2,000.

***The outbreak's ninth death was announced during last week's congressional hearing by Rep. Bart Stupak. . . who chaired the hearing***.

https://www.earlycountynews.com/articles/pca-investigation-continues-texas-plant-linked-to-outbreak/ (emphasis added).

*Blakely receives large food bank donation* (March 11, 2009)

"I heard Blakely's mayor on NPR stating how the town, and county have been devastated by the closing of the peanut plant," stated Mission Central director, Eric DeWalt. "These folks need our help during this incredibly difficult time."

https://www.earlycountynews.com/articles/blakely-receives-large-food-bank-donation/

**Published in Blakely's newspaper, the *Early County News*:**

*Salmonella trial underway* (July 30, 2014):

According to news reports, jury selection began Monday in Albany in the federal ***trial of three Peanut Corporation of America company officials in connection with the 2009 salmonella outbreak that killed nine people and sickened hundreds more.***

The salmonella outbreak was traced to contamination at the [PCA] plants in Blakely and Plainview, Texas, and led to one of the largest food recalls in U.S. history and forced the company into liquidation.

https://www.earlycountynews.com/articles/salmonella-trial-underway/

Parnell also provided the district court with a 23-page list of media reports about the PCA salmonella outbreak, beginning on January 10, 2009, and ending on March 12, 2019. (Doc 701-1) Articles from 2014 (the year of trial) appear at pages 12-22 of that list. (Doc 701-1)

### c. Venirepersons' statements about those news reports, including about the nine deaths, during jury selection.

Venirepersons saw media reports in the days and weeks leading up to jury selection. (Doc 554-Pgs 7, 36-38, 45, 59-60, 82, 91, 224, 224-25, 268-69, 307) The jury selection transcript indicates that media members were in the courtroom. (Doc 554-Pg 148) And jury selection demonstrated that the venirepersons had heard news reports that people had died. (Doc 554-Pgs 7, 36, 38, 59-60, 82, 87, 110-12, 118, 224, 245-46, 268-69, 307) Others heard the same information from co-workers or friends. (Doc 554-Pgs 32, 165)

The media coverage in the run-up to trial included reporting that people had died from the salmonella outbreak. One prospective juror stated:

Yesterday morning I come here for the jury . . . at that time, I heard the news on video Channel 10 news.[3] They talk about the trial, but they said they had killed peanut butter, the poison killed nine people.

(Doc 554-Pg 224)

Another prospective juror said:

I heard about this case through the news at first. I think it made national news a couple years ago, local news. It was actually on the news the morning before we was supposed to report here. It was on the news probably two weeks ago . . . .

(Doc 554-Pgs 268-69) This venireperson knew "that it was a salmonella outbreak" and that "some people died because of it." (Doc 554-Pgs 269-70) She heard about the conditions of the plant, and her husband "worked with a friend who claimed they got sick." (Doc 554-Pg 270) She had "[r]elatives who pulled the peanut butter products out of their own kitchens and wouldn't buy it at the grocery store. . . ." (Doc 554-Pg 270) From this coverage and her conversations, her opinion was

. . . that someone is guilty. People died. The plant was shut down. I mean, I think that's indisputable. My opinion is that someone is responsible. And who that is, I haven't seen the evidence, I don't know. But I truly believe that someone is responsible for it and someone, because people died, should be held responsible for it. . . .

(Doc 554-Pg 272)

---

[3] Channel 10 is WALB, Albany's NBC and ABC affiliate.

Other venirepersons opined that the defendants were guilty based on the extensive media reports. (Doc 554-Pgs 7-8)("It was either last week or week before on the news they was talking about the salmonella case, and they was talking about how much money that they had already had to pay out. ... If they had to pay the people, I feel like they are guilty.");( *Id.* at 72- 75) ("I could think that probably they are [guilty] from what I watched on the news and what we talked about with my wife and friends . . . It is too much gone into this for somebody, you know, not -- just not to be true" and noting wife's response "well, they ought to hang somebody for doing that"); (*Id.* at 79-80)("If there hadn't been something happening, there wouldn't have been Fox news over there or CNN or whoever else was there. . ."; venireperson would have difficulty setting aside what he had heard, read, and seen); (*Id.* at 82) (venireperson heard about it "several years ago and here recently as well," and "due to the fact that there were deaths, I feel like they – they were guilty."); (*Id.* at 247)("I think the fact that . . . somebody died is big enough for me.")

That potential jurors heard about salmonella-related deaths is significant. Prior to trial, Parnell moved, and the government agreed, to

exclude evidence of nine deaths attributed to the salmonella outbreak. (Doc 157-1, Pgs 4-10, Doc 551-Pg 61)) Two venirepersons who had heard about the deaths – jurors 37 and 84 –ended up on the jury despite being informed of deaths by the media reports. (Doc 554-Pgs 44-47, 110)

In a post-trial inquiry hearing, three additional jurors (jurors 10, 12, 34) and three alternates (jurors 98, 112, 116) disclosed that they had heard about the deaths either during the trial or deliberations. (Doc 591-Pgs 33-34; Doc 592-Pgs 84-85, 93, 157-59, 177-78, 191)[4] At that hearing, more information came out about the nine deaths:

- A juror reported that another juror said during jury selection and deliberations that because the defendants "killed nine people, they're all guilty." (Doc 348-Pg 34, 36, 41, 77-78).

- A juror said that during deliberations "a bunch of them in there, they knew about the case" and "they either said seven or nine people died." That juror recalled that "most of the people" around her during jury selection knew about the case, and said things like, "them people killed them people," "they got greedy," and "they need to fry them." (Doc 348-Pgs 31-32, 35-40, 44, 46)

- An alternate juror disclosed for the first time post-trial that he heard hearing prospective jurors during jury selection discussing that local television station "WALB was saying nine

---

[4] While this was an issue resolved on direct appeal, *see Parnell*, 723 Fed. Appx. at 748-51, it is relevant to the *Skilling* discussion – specifically the part about whether the news coverage contained blatantly prejudicial information or reporting that "viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.

people passed" as a result of the salmonella outbreak. (Doc. 349- Doc158-59)

- A second alternate juror admitted that during jury selection his son told him that "nine people died in that thing," (Doc. 349-178). This information did not come out in voir dire.

### d. Venirepersons' entanglement with the peanut industry, whether through financial, personal, or familial ties.

*Skilling* mentions "community prejudice" and analyzes the size and characteristics of the relevant community. *Skilling,* 561 U.S. at 367, 382. Parnell previously spoke generally about the importance of the peanut industry to the southwest Georgia area and Albany Division. But venirepersons volunteered information about their own relationships to the peanut industry and harm (including financial) that they suffered following the PCA salmonella outbreak. Their comments included:

- "I'm third generation peanut farmer in Sumter County. So I have invested thousands of dollars in market promotion and it was tanked. Everything we did was washed away. Not only did they endanger children's lives, they destroyed our market." (Doc 554-Pg 227)

- "I am a peanut farmer, so I have known about it since the start. You know, I -- a lot of it don't need explaining I don't think. I'm mad because it's mixing peanuts that's not American peanuts with it, and it has cost us some market share to these other nuts, and we don't get much for them now because of things like this. . . ." (Doc 554-Pg 205)

- "[T]he peanut industry, whether it be growers, shellers, or transporters make up about -- probably 30 to 40 percent of my revenues." (Doc 554-Pg 48)

- "[A]bout ten years ago my wife worked at [PCA] for about two years." (Doc 554-Pg 77)

- "My husband used to work for Peter Pan . . .." (Doc 554-Pg 83)

- "[M]y brother-in-law works for Birdsong Peanuts, he's the HR manager there. So the peanut thing was, like, trying to build it back up in our area with [P]eanut [P]roud and stuff in Blakely, and my daughter has performed at (sic) lot at that." (Doc 554-Pg 87)

- "I mean, my husband's family used to own Farmer's Fertilizer . . . sold to Birdsong. So, I mean, you know, peanuts are our life . . . ." (Doc 554-Pg 98)

- A venireperson who monitored CB radio as part of his job heard from drivers that "might have driven for Southern AG and hauled the items and that type stuff" and said "stuff about rodents and feces. . . ." (Doc 544-Pg 140)

- "I had some audit clients that are in the peanut industry near the area . . . ." (Doc 554-Pg 199)

- "My family owns [1,000 acres of] farmland and we lease it out, and then I have several audit clients that are related to peanut shelling and inspection services that I have worked with through Mauldin and Jenkins." (Doc 554-Pgs 200-201)

- "I have a lot of friends that work at peanut mills." (Doc 554-Pg 220)

25

- "I have two relatives, one of them worked with [PCA] the peanut company in Blakely, a brother-in-law . . . And I also have another relative that worked for Birdsong Peanut. . . . " (Doc 554-Pg 285)

- "In and around that time, I was working with Ag Alliance, which is out of Sylvester, and we have locations all over the place, and we, in fact, got farmers in the area of Blakely . . . And I have heard about it through some of them eating lunch with them and some things, you know how people talk, from that. And then from the news organizations." (Doc 554-Pgs 254-55)

- A venireperson talked to one of the trial witnesses, who was a "peanut inspector," Darlene Cowart, who would "have to go to court. . . ." (Doc 554-Pg 297)

- "I own about 100 acres in Irwin County, and we lease it out to farmers who grow cotton, peanuts, and soy beans." (Doc 555-Pg 199)(Juror 37)

- "I have a brother-in-law in Mitchell County that farms about 200 acres, peanuts, cotton, and corn, soy beans every other year." (Doc 555-Pg 200)

- "[A] close friend owns a couple thousand acres and he farms cotton and peanuts and corn or whatever." (Doc 555-Pg 200)

- "We have about a hundred acres…. My brother-in-law . . . we rent it to him. He does corn and peanuts and soybeans. . . ." (Doc 555-Pg 201)

- "My family on my side, peanuts, corn, cotton, pretty much lease the land out now. On my husband's side, a lot of peanuts and his family owned a lot of peanut shelling plants and distribution places where the farmers take the peanuts in." (Doc 555-Pg 202)

26

- "My father and my grandfather, we owned a little over 300 acres of farm land, and everybody worked. We had cotton, corn, peanuts, tobacco some years, most of the time peanuts and cotton." (Doc 555-Pg 203)

- "I work with crop dusters as their ground crew, and we spray from cotton, peanuts, beans, and we even put out dry fertilizer." (Doc 555-Pg 203)

- "My son-in-law farms about 1200 acres of peanuts, cotton, and corn." (Doc 555-Pg 203)

One venireperson handled her employer's product recall: "I worked at Walmart, and I know they had a – they had a recall on the peanut butter items that came in . . . that had to be pulled from the shelf." (Doc 554-Pg 165)

The media reports and the venirepersons' ties to the peanut industry generated a deep-seated rancor toward Parnell. One of the venirepersons threatened to "extract (sic) his pound of flesh" and waited for Parnell to leave the courthouse. (Doc 554-Pgs 227-28; Doc 555-Pgs 140-42; Doc 667-2) He later reappeared at the courthouse – "very vocal" and threatening the defendants – so the Marshals notified the judge. (Doc 555-Pgs 140-42)

### e. What happened at trial.

The jury convicted Parnell of all but one of the 68 counts against him. (Doc 285) The verdict form reflects that when given an option, the jury never voted for a lesser-included offense and always found that the food product was adulterated because it contained both a poisonous or harmful substance and was produced in unsanitary conditions. (*Id.*)

The jury acquitted Parnell only on count 60. (Doc 285-Pg 33) That wire fraud count involved an email exchange between Parnell and Danny Kilgore, the plant manager; Kilgore suggested that PCA officials should state to the FDA that a customer rejected peanuts because of size issues, not metal fragments. (Doc 1-Pg 47) Kilgore wrote, "We all need to have our stories straight if and when we are questioned by the FDA." (Doc 1-Pg 47) At trial, Parnell introduced evidence that PCA sought laboratory testing after a customer said it found some metal in chopped peanut granules. (Doc 558-Pg 119)

Parnell's co-defendants fared better. His brother Michael, an independent food broker who oversaw contracts for the purchase of peanut products from PCA, was convicted of 31 counts but acquitted of 12. (Doc 557-Pg 19, Doc 587-Pgs 24-33) Wilkerson, PCA's quality

assurance instruction, was convicted of one count of obstruction and acquitted on a second one. (Doc 557-Pgs 21, 34)

### f. What happened in the §2255 proceedings.

After holding an evidentiary hearing, the magistrate judge in a report and recommendation ("R&R") recommended denial of Parnell's §2255 claims. (Doc 795) Relevant to this appeal, the R&R concluded that Parnell's claims "did not satisfy the standard for changing venue set out in *Skilling*. . . ." (Doc 795-Pg 13) It mentioned the testimony of a co-defendant's attorney that he did not "see it" at the time of trial or at the §2255 hearing since the media attention was "rather mild" and the jury was "pretty well-disciplined." (Doc 795-Pgs 13-14) As for the articles submitted or referenced by Parnell in his briefing and at the hearing, the R&R noted that Parnell was not "mentioned by name" in almost all of them, and that some of the articles were from far-flung media outlets. (Doc 795-Pgs 14-15 & n.3) The magistrate judge did not believe that Parnell's case was an "extreme" one leading to a presumption of prejudice, as contemplated by *Skilling*. (Doc 795-Pgs 17-20) The R&R cited that the Albany Division was "much larger" and often "more urban" than Blakely; that the news reports did not contain

a confession, mention the defendants, or contain "inflammatory information," even if it was "unfavorable" to Parnell; that the media coverage diminished between the 2009 outbreak and the 2014 trial; and that the jury's acquittal of Parnell on a single count indicated that Parnell was not deprived of an impartial trial. (Doc 795-Pgs 17-19) The R&R found, too, that Parnell suffered no actual prejudice. (Doc 795-Pgs 20-23)

The district court "agree[d] with the Recommendation's finding" that "sufficiently prejudicial pretrial publicity saturated the Middle District of Georgia such that prejudice would have been presumed" under *Skilling.* (Doc 803-Pg 5)

This appeal, pursuant to a COA from this Court, ensued.

### 3. <u>Statement of the standard of review.</u>

In reviewing the denial of a §2255 motion, this Court considers fact findings for clear error and legal questions *de novo. McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011). The COA cabins the Court's review to the enumerated issues. *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010).

## SUMMARY OF THE ARGUMENT

Albany, Georgia considers itself the Peanut Capital of America. Parnell's trial occurred in the Albany Division of the Middle District of Georgia, where approximately 8,000 people are on the jury roll. The venirepersons who reported for jury duty had deep ties to the agricultural community. About 60% of the venirepersons who reported had heard something about this case from the media or community members; some of the venirepersons had even heard news reports linking nine deaths to the salmonella outbreak at PCA, including news reports to that effect the day they reported for jury selection. The nine deaths did not come into evidence at trial; the government agreed not to introduce that evidence. Nonetheless, two venirepersons who knew about the deaths made it onto the jury. The effect and spread of the media reporting was clear during jury selection. It caused venirepersons to opine – especially with respect to the deaths – that Parnell was guilty. Venirepersons used phrases like "hang" and "exact a pound of flesh" and "fry them." The jury convicted Parnell of 67 of the 68 counts against him. The circumstances of his case warrant a presumption of

prejudice under *Skilling* in light of the media reports and community sentiment.

The district court rejected on the merits Parnell's claim that his counsel performed deficiently when they failed to seek a change of venue. *Skilling* should extend a presumption of deficient performance in these circumstances. *Strickland* does not set mechanical rules, but focuses ultimately on the fundamental fairness of the proceedings. The right to trial by an impartial jury invokes concerns of fundamental fairness, which requires relief here.

## ARGUMENT AND CITATION OF AUTHORITY

For the reasons below, Parnell has established a presumption of jury prejudice under *Skilling*. This showing operates to establish both prongs of an ineffective assistance claim.

1. **Whether the district court erred in determining that Parnell could not establish a presumption of jury prejudice, based on adverse pretrial publicity, under *Skilling v. United States*, 561 U.S. 358 (2010).**

"The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010). While the Constitution designates that a trial occurs in the

state and district in which the crime was committed, *see* Art. III, § 2, cl.

3, amend. 6, these place-of-trial prescriptions do not prevent transfer of

the proceeding to a different district at the defendant's request "if

extraordinary local prejudice will prevent a fair trial—a 'basic

requirement of due process.'" *Skilling,* 561 U.S. at 377-78 (quoting *In re*

*Murchison*, 349 U.S. 133, 136 (1955)).  "The theory of our [trial] system

is that the conclusions to be reached in a case will be induced only by

evidence and argument in open court, and not by any outside influence,

[like] private talk or public print." *Patterson v. Colorado,* 205 U.S. 454,

462 (1907).

The standards governing pretrial publicity relative to the

necessity for a change of venue

> derive from the Fourteenth Amendment's due process clause,
> which safeguards a defendant's Sixth Amendment right to be tried
> by a panel of impartial, indifferent jurors. The trial court may be
> unable to seat an impartial jury because of prejudicial pretrial
> publicity or an inflamed community atmosphere. In such a case,
> due process requires the trial court to grant defendant's motion for
> a change of venue. . . .

*Meeks v. Moore*, 216 F.3d 951, 960 (11th Cir. 2000)(quoting *Coleman v.*

*Kemp*, 778 F.2d 1487, 1489 (11th Cir.1985)(internal citations and

quotation marks omitted).  Prejudice is presumed from adverse pretrial

publicity when the publicity surrounding a case is "sufficiently prejudicial and inflammatory" and it "saturated the community where the trial[] [was] held." *Kemp*, 778 F.2d at 1490. "[W]here a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, jury prejudice is presumed and there is no further duty to establish bias." *Id.* (internal citations, alterations and quotation marks omitted).

This does not mean that a defendant is entitled to a change of venue whenever potential jurors have been exposed to the facts of the case. But when inflammatory, prejudicial pretrial publicity so pervades or saturates the community that it is virtually impossible for the defendant to receive a fair trial by an impartial jury drawn from the community, jury prejudice is presumed. *See Kemp*, 778 F.2d at 1490; *Meeks*, 216 F.3d at 961 (quoting *Manning v. State*, 378 So.2d 274, 276 (Fla. 1979)("[A] determination must be made as to whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters

out of their minds and try the case solely on the evidence presented in the courtroom."). Prejudice can be presumed where there is evidence of "a trial atmosphere that had been utterly corrupted by press coverage." *Dobbert v. Florida*, 432 U.S. 282, 302 (1977).

*Skilling* employed several factors to determine whether prejudice can be presumed from adverse pretrial publicity. *First*, courts should look to "the size and characteristics of the community in which the crime occurred." 561 U.S. at 382. *Second*, courts should look to whether news stories about the allegations in the indictment contained blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. *See Skilling*, 561 U.S. at 382. *Third*, courts should consider whether "the decibel level of media attention" diminished during the run-up to the trial. *See Skilling*, 561 U.S. at 382. *Fourth*, courts should analyze whether the verdict "undermine[d] in any way the supposition of juror bias." *Skilling*, 561 U.S. at 383. These factors, applied to this case, give rise to a presumption of prejudice.

### a. The size and characteristics of the community.

Houston, Texas – the site of the trial in *Skilling* – "is the fourth most populous city in the Nation," with "more than 4.5 million individuals eligible for jury duty" in the area. *Skilling*, 561 U.S. at 382. "Given this large, diverse pool of potential jurors," it was "hard to sustain" a suggestion that 12 impartial jurors could not be empaneled. *Id*. Neither Blakely, Georgia (the site of PCA) nor the Albany Division of the Middle District of Georgia would ever be mistaken for a sprawling metropolitan region. Houston had "more than 4.5 million individuals eligible for jury duty" in Skilling's trial. At Parnell's trial, the jury pool for the Albany Division was "over 8,000 in number." (Doc 795-Pg 17)

*Skilling* involved the collapse of Enron, "one of the world's leading energy companies" that "spiraled into bankruptcy" and gutted stock prices. *Skilling*, 561 U.S. at 368. Parnell's case involved peanuts in the Peanut Capital of America. Ties to agriculture generally and peanuts specifically abounded in the venire, denizens of the poorest, least-populous corner of Georgia that comprises the Albany Division. The PCA salmonella outbreak ruined the local economy and affected all

parts of the peanut business. Juror 127 best expressed the community's

hostility toward PCA due to the devastating impact the salmonella

outbreak had on people's lives, including his own:

> I'm third generation peanut farmer in Sumter County. So
> I have invested thousands of dollars in market promotion
> and it was tanked. Everything we did was washed away.
> Not only did they endanger children's lives, they
> destroyed our market.

(Doc 554-Pg 227) This juror wanted a "pound of flesh" and waited

around the courthouse after jury selection. (*Id.* at 227-28, Doc 555-Pgs

140-42, Doc 667-2)

The venire that presented for this case was uniquely informed

about the events surrounding PCA, a fact reflected in this observation

by the trial judge:

> I think this is the first time in my memory of 20-
> something years on the bench and 30-something years as
> a lawyer that we spent all day on one question [i.e., what
> you've heard about this case, what you know about it,
> and how you got to know it, and the circumstances].

(Doc 554-Pgs 214-15) That day began at 8:30 a.m. (Doc 553-Pg

150), and while the transcript does not indicate when the day

ended, the judge described it as a "long, long day[]." (Doc 554-

Pg 332)

**b. Whether news stories about the allegations in the indictment contained blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.**

*Skilling* observed that while news stories about that defendant "were not kind, they contained no confession or other blatantly prejudicial information of the type readers or views could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. "Pretrial publicity about Skilling was less memorable and prejudicial," and contained "[n]o evidence of the smoking-gun variety [that] invited prejudgment of his culpability." *Id.* at 383. The venirepersons' statements during voir dire and in the post-trial hearing indicate that news reports about salmonella-related deaths were memorable and prejudicial, and they invited prejudgment of Parnell's culpability.

There is no doubt that the information was highly prejudicial. In response to the defense motion in limine to exclude evidence related to any deaths as irrelevant and prejudicial (Doc 157-1-Pgs 4-10), the government made this statement at the motions hearing:

> . . . We don't intend to put on evidence that people died from the salmonella that emanated from the PCA plant. What we intend to put on is evidence that people were sickened. We have an obligation putting on our evidence to make sure that we don't overstep the bounds of the evidence and it goes into the area of

38

> prejudicial evidence that would be objected to by the defense and, on appeal, may be the basis for reversal. We have to have our eyes on that also.

(Doc 551-Pg 61) It is a fair reading that the prejudicial nature of death evidence led the government to decide not to introduce it at trial.

Death evidence (or more accurately, news reports linking deaths to PCA) is "evidence of the smoking-gun variety" that jurors could not reasonably be expected to shut from sight. They didn't here. Venirepersons remembered these reports. They used strong language to express themselves. They brought it up at jury selection, opining things like the deaths made the venireperson "feel like [the defendants] – they were guilty" or that the "fact that . . . somebody died is big enough for me" or that "because people died, [someone] should be held responsible for it." (Doc 554-Pgs 7, 32, 36, 38, 44-47, 59-60, 82, 110-12, 118, 165, 224, 245, 247, 268-69, 307) It prompted venirepersons to say things like "they need to fry them." (Doc 348-Pgs 31-32, 35-40, 44, 46) One venireperson relayed that his wife thought that the defendants should be hung. (Doc 554-Pgs 79-80)

*Skilling* discussed the "foundation precedent" of *Rideau v. Louisiana*, 373 U.S. 723 (1963). *Skilling*, 561 U.S. at 378. Rideau

"robbed a bank in a small Louisiana town, kidnaped three bank employees, and killed one of them." *Id*. Police interrogated Rideau without counsel present, and then distributed the surreptitiously filmed interrogation to local media. *Id*. "On three separate occasions shortly before trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals" in a parish that had a population of 150,000. *Id*. The televised confessions, showing "Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission" of the charged crimes, which was "in a very real sense . . . Rideau's trial – at which he pleaded guilty." *Id*. at 379. The Court cited two other cases, where media "bombard[ed] . . . the community" with the case and disrupted the "judicial serenity and calm" to which the defendant was entitled, and where the media coverage made a "'carnival atmosphere' pervade[] the trial." *Id*. at 379-80, *citing Estes v. Texas*, 381 U.S. 532 (1965), *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

Between 1/6 to 1/3 of the Louisiana parish tuned in to see Rideau's confession. Roughly 60% of Parnell's venire indicated that they had personal knowledge of the case from the news (print, TV, national and local media), their workplaces, family members, friends in the industry,

business dealings, and simply living in the area. A number of venirepersons heard reports of deaths on the news and from friends, and two of those venirepersons became jurors. While "juror exposure to . . . news accounts of the crime . . . alone [do not] presumptively deprive[] the defendant of due process," an extreme case does. *Skilling*, 561 U.S. at 381. "[P]retrial publicity and community prejudice" prevented Parnell from obtaining a fair trial here. *Id.* at 367.

### c. "The decibel level of media attention" in the run-up to the trial

In *Skilling*, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and although there was news coverage throughout this period, "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Skilling*, 561 U.S. at 383. This is, of course, in the context of a case that happened in the "fourth most populous city in the Nation," with "more than 4.5 million individuals eligible for jury duty" in the area. *Id.* at 382. Parnell's peanut-based case was tried in an area where 60% of domestic peanuts are grown,

small towns have peanut festivals,[5] and about 8,000 were available to serve on a federal jury.

Venirepersons talked about seeing media coverage immediately before jury selection. (Doc 544-Pgs 36, 59, 224-25, 268-69, 307) Even the trial judge even mentioned having seen "a report on WALB last night" about the trial. (Doc 554-Pg 148) That report talked about the trial and said that the "poison" in the peanut butter "killed nine people." (Doc 554-Pgs 224-25) An alternate juror allowed that he had seen that report (Doc 349-Pgs 158-59), although he did not disclose it at jury selection.

*Skilling* considered whether "pretrial publicity and community prejudice" prevented Skilling from obtaining a fair trial. *Skilling*, 561 U.S. at 367. Parnell did not face only adverse pretrial publicity, including reports immediately prior to trial of deaths on the single local television station in the Albany Division. He faced pervasive community animus against him and his company from a small, peanut-proud citizenry.

---

[5] A venireperson, whose brother-in-law was the HR manager for Birdsong Peanuts, remembered that "the peanut thing was, like, trying to build it back up in our area with [P]eanut [P]roud and stuff in Blakely, and my daughter has performed a lot at that." (Doc 554-Pg 87)

### d. A verdict that did not undermine the supposition of jury bias.

Skilling's jury convicted him of 19 counts but acquitted him of nine insider-trading counts, a fact that the Supreme Court called "of prime significance." *Skilling*, 561 U.S. at 375, 383. The Court, too, noted that earlier Enron-related cases "yielded no overwhelming victory for the Government." *Id.* at 383.

In contrast, Parnell faced 68 counts. The jury acquitted him of a single wire fraud count, count 60. (Doc 620-Pg 1) Parnell stood trial with two co-defendants, his brother Michael and Mary Wilkerson. Michael was an independent food broker who oversaw contracts for purchase of peanut products from PCA (Doc 557-Pg 19) The jury acquitted him of 12 counts, but convicted him of 31 counts. (Doc 587-Pgs 24-33) Wilkerson, the quality assurance manager at PCA, was convicted of one count, and acquitted of a second count, of obstruction of justice. (Doc 557-Pg 21, Doc 557-Pg 34)

PCA's plant manager testified that Parnell was the ultimate decision maker for PCA. (Doc 577-Pg 23) One venireperson, while professing to keep an open mind, described this effect of Parnell's leadership role:

Because he was the CEO of the company, a little part of me tells me that, you know, if he didn't know, he should have known, he should have trusted people under him. He probably couldn't possibly know everything, but he, I guess, is responsible for appointing people under him that should have known something was wrong . . . .

(Doc 554-Pg 274)

In light of the pretrial publicity, community animus, and Parnell's role as CEO, his acquittal on a single count does not undercut the supposition of juror bias. The district court erred when it refused to apply a presumption of prejudice.

## 2. Whether a showing of presumed jury prejudice, under *Skilling,* operates to establish both prongs of an ineffective assistance of counsel claim, based on counsels' failure to move for a change in venue.

To show ineffective assistance of counsel, a §2255 petitioner typically must show two things. *First*, he must demonstrate deficient performance, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When considering deficient performance at the guilt stage of trial, a petitioner must demonstrate that absent counsel's errors, the result of the proceeding would have been different. *Id*. at

694. The error must be "so serious that counsel was not functioning at the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 697. And the error must be "so egregious that no reasonably competent attorney would have acted similarly." *Harvey v. Warden*, 629 F.3d 1228, 1239 (11th Cir. 2011)(subjecting counsel's failure to challenge particular juror to *Strickland* standard).

There are no fixed or rigid rules in this inquiry. *Id.* A defendant receives ineffective assistance if the attorney's representation falls below "an objective standard of reasonableness," with reasonableness being "prevailing professional norms." *Id.* Courts presume that counsel provided representation "within the 'wide range' of reasonable professional assistance," meaning that a defendant, to succeed, must show that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

*Second*, he "must show that the deficient performance prejudiced the defense," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." *Id.* at 687.

*Strickland* cautioned courts to remember "practical

considerations," the "[m]ost important" one being this:

> . . . in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, *the ultimate focus of inquiry must be on the fundamental fairness of the proceeding* whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Id*. at 696 (emphasis added).

An analysis of the facts and circumstances of this case under

*Skilling* leads to a presumption of prejudice based on adverse pretrial

publicity. What to do, then, with the deficient performance prong?

Parnell lost this issue on the merits in district court. At the §2255

evidentiary hearing, he elicited evidence that neither "venue" nor

"transfer" appeared in trial counsel's hundreds of pages of billing

records. (Doc 777-Pgs 204-05, DX1-5) Lead counsel testified that he was

"sure" he researched venue concerns (although he had no memory of

pulling a particular case), and second chair said only that he "typically"

would "review the rules and the annotations to the rules in books." (*Id*.

at 121, 230) The lawyers testified that they "talked about" venue. (*Id*.)

Local counsel "believe[d]" that the issue of venue came up prior to trial, but he "wasn't part of those discussions" or the decision. (*Id.* at 12-13) The second-chair lawyer – acknowledging the economic downtown from the PCA affair and "folks['s] . . . deep-seated animus" toward Parnell – described a motion to change venue in this case as "meritorious" and "not inappropriate," with the real concern being that "it would be granted." (*Id.* at 233)

Counsel, too, was from Virginia, and drew their conclusions about the local venire from five trips to Albany prior to trial (often by private plane) for a total of 12 days in a 15-month period; discussions with local (a cab driver, someone at a local inn, and "people" in the peanut industry); and information gathered by their Virginia-based investigator. (Doc 777-Pgs 85, 117, 120, 151-52, 198, 212) While the defense team was aware of the widespread publicity surrounding the case, they did not subscribe to local papers or monitor local television coverage. (Doc 175-1-Pg 1; Doc 777-Pgs 86-89)

But the district court believed that "the decision not to pursue a motion to change venue was a considered, strategic choice":

> For instance, [lead counsel, an experienced attorney] – testified that he was aware other attorneys agreed to keep the trial in

Albany because they thought they "had a good shot of keeping out falsified certificates," and "people in Albany . . . [would] not hold [the unsanitary conditions and mice, which were problems in peanut plants in South Georgia] against [Parnell] so much as somebody in Atlanta might . . . Other attorneys also testified that their strategy was to "blame the FDA" and that people in the Albany area seemed to have a better understanding of rural agriculture, which could best serve [Parnell's] interest. . . .

(Doc 803-Pg 4)

Despite the district court's finding of no deficient performance here, a showing of presumed jury prejudice under *Skilling* operates to establish both prongs of an ineffective assistance of counsel claim based on trial counsel's failure to move for a change in venue. Parnell could find no case on point, but precedent supports this course. *Strickland* cautioned courts to remember "practical considerations," eschews "mechanical rules," and keeps "the ultimate the focus of inquiry" on the "fundamental fairness of the proceeding. . . ." *Strickland*, 466 U.S. at 696; *see also United States v. Cronic,* 466 U.S. 648, 658 (1984)(stating that "the right to the effective assistance of counsel is not recognized for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated"). "The constitutional standard of fairness

requires that a defendant have 'a panel of impartial, 'indifferent' jurors." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). A just result cannot ensue from "inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community . . . ." *Kemp,* 778 F.2d at 1490.

Another point to consider is structural error. Parnell contended that the *Skilling* error led to structural error given that the right to a fair and impartial venire is a fundamental trial right. (Doc 667-1-Pgs 16-20) Structural error and ineffective assistance doctrines are "intertwined; for the reasons the error is deemed structural may influence the proper standard used to evaluate an ineffective-assistance claim premised on the failure to object to that error." *Weaver v. Massachusetts*, 582 U.S. 286, 294 (2017). Constitutional error generally does not automatically require reversal of a conviction if the government can show beyond a reasonable doubt that the error did not contribute to the verdict. *Id.*, *citing Chapman v. California*, 386 U.S. 18, 24 (1967).

But structural errors are constitutional errors that cannot be deemed harmless beyond a reasonable doubt. "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Weaver*, 582 U.S. at 294-95, *citing Arizona v. Fulminate*, 499 U.S. 279, 309-10 (1991). Three broad rationales undergird structural error: 1) "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," 2) "if the effects of the error are simply too hard to measure," and 3) "if the error always results in fundamental unfairness." *Weaver,* 582 U.S. at 295-96.

Like *Strickland's* ultimate focus on fundamental fairness, *Weaver* allows that structural error may influence the standard to use in ineffectiveness claims. "One touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984). Parnell's jurors were tainted by intense, prolonged, and prejudicial publicity, as well as by being asked to adjudge conduct that adversely affected their community and economic interests. They were

tainted by knowledge from the media that nine deaths had been attributed to the salmonella outbreak at PCA, evidence that the government agreed to exclude.

Parnell argued in district court that structural error warranted reversal without a showing of prejudice. (Doc 667-1-Pg 20) A presumption of jury prejudice under *Skilling* should extend to the deficient performance prong of an ineffective assistance of counsel claim. When faced with publicity in a community that erodes the Sixth Amendment guarantee of trial before an impartial jury, no attorney functioning as the Sixth Amendment requires would have chosen that course.

## CONCLUSION

For these reasons, the Court should reverse the denial of Stewart Parnell's 28 U.S.C. §2255 motion.

Respectfully submitted this 25th day of July, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

602 Montgomery Street
Savannah, Georgia 31401
912.807.5000
ALC@roco.pro

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 10,415 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

This 25th day of July, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

## CERTIFICATE OF SERVICE

I served a copy of this Brief of Appellant on counsel for the government by filing it on the Court's EC/CMF portal, which emails to all counsel of record a link to a file-stamped .pdf copy of the brief.

This 25th day of July, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

602 Montgomery Street
Savannah, Georgia 31401
912-807-5000
ALC@roco.pro